SOUTHWEST INDUSTRIES INVESTMENT COMPANY, Appellant,

v.

Bryant SCALF, Individually and d/b/a Bryant Scalf Insurance, Appellee.

No. 20208.

Court of Civil Appeals of Texas, Dallas.

June 20, 1980.

Rehearing Denied July 31, 1980.

David B. Fagg, Dallas, for appellant.

Grover Hartt, Jr., Dallas, for appellee.

Before GUITTARD, C. J., and AKIN and STOREY, JJ.

GUITTARD, Chief Justice.

Bryant Scalf, an insurance agent, sued Southwest Industries Investment Company to recover a premium allegedly advanced by him to secure fire insurance coverage on properties owned by Southwest. Southwest rejected the coverage and denied that Scalf had authority to obtain it. Trial to a jury resulted in a verdict and judgment for Scalf for the amount sued for and an attorney's fee. We reverse the judgment on the ground that various documents offered by Scalf in support of his claim were not properly authenticated under article 3737e, Tex. Rev.Civ.Stat.Ann. (Vernon Supp.1980). Consequently, we remand for a new trial.

The evidence shows that negotiations concerning insurance coverage took place between Scalf and Faye Hiller, principal officer and sole stockholder of Southwest. Southwest had acquired certain apartment properties needing rehabilitation and was required by the lending bank to carry insurance for the amount of its loan of $606,000. Scalf was a local recording agent for sever-al standard companies and undertook to obtain the coverage. He was unable to secure standard fire coverage and contacted the Russell Grace Insurance Agency, which dealt in special risk insurance. Scalf testified that he did not discuss the form of the policy with Hiller, but did discuss with her a premium of $24,000 for $1,270,000 coverage or about $18,000 for coverage of $904,000. According to Scalf, the reason for coverage in excess of the amount of the loan was that the value of the properties after rehabilitation would be substantially more, and higher coverage would avoid the necessity of an additional policy to cover the builder's risk. He said that he explained to Hiller that a minimum premium of twenty–five percent would be required in event of cancellation, and she told him to go ahead and get a binder for such coverage.

Scalf originally obtained an agreement from the Grace Agency for coverage in the amount of $1,270,000, but this amount was later reduced to $904,000. He then wrote Southwest a letter dated September 9, 1977, advising that coverage had been obtained and enclosing a bill showing a premium of $18,080, with a down payment of $4,520. Also enclosed with the letter was a premium finance agreement for the balance to be signed by Southwest. Hiller returned this agreement with a letter stating that Southwest refused to accept the policy. Southwest later procured insurance through another agent covering only the amount of the loan.

After receiving the letter of refusal, Scalf sent Southwest a written binder issued by the Grace Agency providing coverage of $904,000 with a deductible of $2,500 for each occurrence and subject to a favorable inspection report and a twenty–five percent minimum premium. Hiller returned this binder without inspection. Scalf subsequently demanded payment of the minimum premium which amounted to $4,520 plus additional amounts for tax and policy fee. Payment was refused and Scalf filed this suit in the form of a sworn account under Rule 185, Tex.R.Civ.P.

Hiller denied that she authorized Scalf to obtain coverage in the amount and on the terms shown in the binder. She testified that she recalled discussing the matter with Scalf by telephone, but insisted that she requested coverage only in the amount of the loan of $606,000, and understood that the premium would be between $13,000 and $14,000. Other amounts of insurance were discussed, she said, in the context of what might be needed after the apartments were rehabilitated. When she received the bill and premium finance agreement from Scalf, she was upset because the cost was higher than she had understood by three or four thousand dollars. She then caused these items to be mailed back to Scalf, along with the letter of refusal. According to Hiller, Southwest did not become aware of the twenty–five percent minimum premium requirement until it had refused the proposed coverage. She testified that Southwest never authorized or requested Scalf to make any premium payment in its behalf.

In answer to special issues, the jury found that Scalf was authorized by Southwest to secure coverage in the amount of $904,000, that Scalf did so, that Southwest owed Scalf $4,719 for securing such insurance, and that he should recover a reasonable attorney's fee of $5,000. Judgment was rendered accordingly.

### 1. Evidence of Business Records

By several points, Southwest complains of the admission of certain documents, most of which came from the files of the Russell Grace Insurance Agency. In particular, "plaintiff's exhibit 11" was the Grace agency's file of papers relating to the binder which Scalf procured through that agency, including a copy of the binder, a copy of the proposed policy to be issued by International Fire and Casualty Insurance Company, a binder for $1,150,000 dated September 7, 1977, on behalf of "Interstate Insurance Group," written communications between Scalf and the Grace agency, telegraphic messages between unidentified persons, photographs of various buildings, a notice

of cancellation showing the amount of the minimum premium, and a letter from the Grace agency to Scalf's attorney reciting the issuance of the policy and its cancellation, the amount of the premium and of the minimum premium claimed, and the fact of payment of the minimum payment by Scalf.

All of these documents were offered in evidence as one exhibit. Southwest objected on the ground that the information in the file was not shown to be made on personal knowledge or to have been received on or about the time the entries were made. In an attempt to meet this objection, Scalf offered the testimony of Robert Grace, an employee of the Grace agency, who testified that he had control over the files, that various memoranda in the file "appeared" to have been made by certain employees of the agency at or shortly after the time of the event recorded and that letters and other documents covering the issuance of policies were customarily filed as received. There was no testimony, however, that it was the regular course of business of the Grace agency for an employee with personal knowledge of the facts to make each of the various types of memoranda or records in the file or to transmit information to be included in such memoranda or records, as required by article 3737e, Tex.Rev.Civ.Stat.Ann. (Vernon Supp. 1980). Much of the file consisted of letters and other communications between the Grace agency and other persons. We hold that this statute does not make admissible an entire file of correspondence and other papers concerning a particular matter by general testimony of someone familiar with the file that it was the regular course of the business to accumulate such a file. The statute is limited to memoranda and records made by employees of the business in the regular course of that business, and proof must be made that the employee who made the record, or transmitted the information to another employee to record, had personal knowledge of the facts recorded. *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.,* 436 S.W.2d 889, 891 (Tex.1969); *Hanson Southwest Corp. v. Dal–Mac Construction Co.,* 554 S.W.2d 712, 725 (Tex.Civ.App.–Dal-

las 1977, writ ref'd n. r. e.). Consequently, the statute does not authorize admission of records of information received from other sources. *Wills v. R. G. Beneke & Co.*, 570 S.W.2d 79, 80 (Tex.Civ.App.–Dallas 1978, writ ref'd n. r. e.); *Vahlsing Christina Corp. v. Ryman Well Service, Inc.*, 512 S.W.2d 803, 812 (Tex.Civ.App.–Corpus Christi 1974, no writ). Neither does it extend to communications concerning past transactions. *Hallmark Builders, Inc. v. Anthony*, 547 S.W.2d 681, 682–83 (Tex.Civ.App.–Amarillo 1977, no writ).

If such letters or communications are not hearsay and are otherwise relevant, they may be individually authenticated and received in evidence, but no attempt was made to follow that procedure with respect to the documents included in "plaintiff's exhibit 11." For example the letter from the Grace agency to plaintiff's counsel is dated more than a year after the transaction took place and summarizes the facts on which Scalf's claim is based. Yet it was tendered, along with the other contents of the file, as the agency's "business records." Under the circumstances, we hold that the trial court erred in admitting "plaintiff's exhibit 11."

■ Other documents from the Grace agency were admitted over the objection of Southwest. "Plaintiff's exhibit 13" is a statement to Scalf from the Grace agency concerning the Southwest coverage, showing charges of $18,080 for the premium, $50 policy fee, and $698.01 state tax. "Plaintiff's exhibit 14" is another statement to Scalf from Grace showing credits of $13,560 for cancellation of the policy and $522.06 for return of the state tax. "Plaintiff's exhibits 16" and "17" are statements covering the same items. These documents were admitted on the testimony of Robert Grace that they were business records of the Grace agency and were "products of our accounting system." Otherwise, none of the requisites of article 3737e are shown. Robert Grace did not testify that the statements were, in fact, delivered to Scalf. Counsel for Scalf offered them with the statement that they are "admissible with-

out regard to business record evidence rules." His brief in this court does not present any theory supporting the admission of this evidence. He argues here only that Robert Grace had testified on his own personal knowledge that Scalf had paid the amounts shown. We hold that plaintiff's exhibits 13, 14, 16 and 17 were not sufficiently authenticated under the business records rule or in any other manner, and, consequently, that the court erred in admitting them in evidence. *Steve's Sash & Door Co. v. WBH Int'l,* 575 S.W.2d 355, 357 (Tex. Civ.App.–San Antonio 1978, no writ); *Hanson Southwest Corp. v. Dal–Mac Construction Co.*, 554 S.W.2d 712, 722–23 (Tex.Civ. App.–Dallas 1977, writ ref'd n. r. e.).

■ Exhibit 15 appears to be a cancelled check from Scalf to the Grace agency in the amount of $2,540.04, bearing the notation "Southwest Ind. Inv." It was admitted over objection without any testimony concerning the circumstances of its delivery or the particular account to which it was applied. We hold that this exhibit has not been sufficiently identified to be competent proof of any fact in this case.

■ If the evidence above discussed is excluded, the remaining evidence is insufficient to support the judgment in favor of Scalf. Consequently, the judgment must be reversed and the cause remanded for another trial. *Hanson Southwest, supra,* at 723.

### 2. Scalf's Standing to Sue

■ Southwest further contends that the court erred in failing to render judgment in its favor because there is no evidence of Scalf's standing to bring the action. Under this contention the argument is made that Scalf has not shown that he, as distinguished from the Grace agency or Interstate Fire and Casualty Company, is entitled to recover the minimum premium sued for. Scalf responds that he is subrogated to this claim because he paid the amount of the minimum premium, policy fee, and tax to the Grace agency. Southwest insists that there is no evidence of such payment.

We agree that Scalf has failed to establish payment. Although Scalf testified at some length, he was never asked about this payment. Robert Grace testified that Scalf paid for the policy. He testified that he had "personal knowledge" of such payment, but explained on voir dire that this knowledge was based on a review of the agency's accounting records, and since those records showed no balance due from Scalf, he concluded that this item was paid. Southwest objected that this testimony was hearsay because it was based on Grace's examination of summaries of records of which he had no personal knowledge. This objection was well taken. The accounting records on which the testimony was based were not introduced. Neither were they identified and made available for inspection by Southwest. Consequently, Grace's testimony was not admissible. *Sherwin–Williams Co. v. Perry Co.*, 424 S.W.2d 940, 946 (Tex.Civ. App.–Austin), *writ ref'd n. r. e. per curiam*, 431 S.W.2d 310 (Tex.1968); *see Black Lake Pipe Line Co. v. Union Construction Co.*, 538 S.W.2d 80, 92–94 (Tex.1976) (summaries of records inadmissible unless underlying records authenticated and made available). Though admitted by the trial court, it was not properly admitted, and, therefore, was not competent proof of payment by Scalf. *Aetna Ins. Co. v. Klein*, 160 Tex. 61, 325 S.W.2d 376, 379 (1959).

In his petition, Scalf alleges that he is "the legal owner and holder of said statement of account." He sought to establish his ownership of the claim by proof that he had paid the minimum premium and other charges, and, therefore, was subrogated to the claim. He does not suggest in his brief any other basis for recovery. Since we find the evidence insufficient to establish such payment, the judgment must be reversed on this ground also. *See J. E. Earnest & Co. v. Word*, 137 Tex. 16, 152 S.W.2d 325, 326–27 (1941).

### 3. Special Issues

Since we are remanding for another trial, we consider also Southwest's complaints concerning the special issues, although we do not reverse on that ground. Southwest contends that the issues submitted by the court are erroneous because they do not submit all the elements of the contract on which Scalf seeks to recover. Southwest points out that the issues as submitted inquire only whether Scalf was authorized to secure coverage for $904,000 and did secure such coverage, whereas Scalf alleged and recovered on a contract not only to secure coverage for $904,000, but also to obtain a binder for a policy with a total premium of $18,080, a minimum premium of $4,520 plus $174.02 state tax and $50 policy fee and subject to a favorable inspection report. Southwest also insists that issues should have been submitted inquiring whether Scalf was authorized to advance premiums on its behalf to the insurance company and then to subject Southwest to the obligation to pay him $4,744.07. Southwest requested separate issues covering each of these matters and complains of the court's refusal to submit them.

We conclude that Scalf did not have the burden to obtain separate jury findings establishing that each provision of the binder obtained by him was within the authority conferred by Southwest. The issue was whether Southwest had authorized Scalf to obtain the binder in question. We suggest that such an issue be submitted on another trial. The trial court has discretion to submit issues broadly and may combine elements of recovery. *Haas Drilling Co. v. First National Bank*, 456 S.W.2d 886, 889 (Tex.1970); Tex.R.Civ.P. 277.

Southwest also complains of the court's failure to submit its requested definitions of "contract," "agreement," "mutual assent," "consideration," and "agent." We find no error in the refusal of these definitions. None of these appeared in the court's charge; consequently, the definitions would have been no help to the jury if they had been given. *First State Bank & Trust Co. v. George*, 519 S.W.2d 198, 207 (Tex.Civ.App.–Corpus Christi 1974, writ ref'd n. r. e.); *Pacific Indemnity Co. v. Arline*, 213 S.W.2d 691 (Tex.Civ.App.–Beaumont 1948, writ dism'd).

Reversed and remanded.