**HOUSTON SHELL & CONCRETE COMPANY, Appellant,**

v.

**KINGSLEY CONSTRUCTORS, INC., Appellee.**

No. 14–97–00104–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 25, 1999.

Joe S. Maida, Houston, for appellant.

William C. Ferebee, Houston, David B. Koch, Dallas, for appellee.

Panel consists of Justices MAURICE E. AMIDEI, FOWLER, and DRAUGHN.

## OPINION

WANDA McKEE FOWLER, Justice.

Houston Shell & Concrete Company appeals a judgment in favor of Appellee, Kingsley Constructors, Inc.. Houston Shell appeals on three points of error. We affirm the trial court judgment.

1. Two bond companies—Planet Insurance Company and Reliance Insurance Company—who were sureties on the project also were defen-

## BACKGROUND FACTS

From March 1988 until January 16, 1992, Houston Shell entered into several contracts to be Kingsley's subcontractor on several construction projects. These contracts required Houston Shell to supply concrete to Kingsley to be used in various road building projects. Kingsley paid Houston Shell $2.5 million but failed to pay all of Houston Shell's invoices. As a result, Houston Shell sued Kingsley to recover $700,000. Kingsley counterclaimed against Houston Shell for breach of contract and violation of the Texas Deceptive Trade Practices Act. Kingsley claimed Houston Shell breached its contracts on eight jobs in two respects. First, it claimed Houston Shell failed to provide concrete at the correct rate and second, that Houston Shell did not provide the correct amount of concrete. Kingsley claimed it was damaged because of the breaches. The parties stipulated that Kingsley owed Houston Shell $615,868 under the contracts and proceeded to trial only on Kingsley's counterclaim. A jury determined that Houston Shell overbilled for concrete not delivered and breached its contract to deliver at a specific rate. The trial court held Kingsley entitled to $836,763.62 on its counterclaim and Houston Shell entitled to a total $834,-303.61 (i.e. the $615,868 stipulated to by the parties plus prejudgment interest). After offsetting these amounts, the court rendered judgment in favor of Kingsley for $2460.01.[1] Houston Shell appeals the judgment against it in three points of error.

## DISCUSSION AND HOLDINGS

In its first point of error Houston Shell maintains that the trial court erred when it allowed the introduction of test core results as business records under Texas rule of evidence 803(6). See TEX.R. EVID. 803(6). According to Houston Shell, the introduction of the records was harmful error because they provided the basis for Kingsley's testimony that there was a shortage of concrete. As we explain below, the trial court properly allowed the introduction of the results be-

dants, but the trial court rendered take nothing judgments against them.

cause Kingsley established a predicate to introduce them as business records.

These test core results were prepared by the State of Texas and an independent testing laboratory. Mr. Kingsley, president of Kingsley, authenticated the results prepared by these two other entities. Houston Shell claims that Kingsley could not authenticate the business records of another company. But, Texas case law has held to the contrary.

Rule 803(6) reads as follows:

**(6) Records of Regularly Conducted Activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by affidavit that complies with rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. "Business" as used in this paragraph includes any and every kind of regular organized activity whether conducted for profit or not.

*Id.*

As the rule itself states, the prerequisites of rule 803(6) may be provided by a "qualified witness." *Id.* "Rule 803(6) does not require a witness laying the predicate for introduction of a business record to be the creator of the document or even an employee of the company keeping the subject record." *Huff v. State,* 897 S.W.2d 829, 839 (Tex. App.—Dallas 1995, pet. ref'd). What the rule does require, however, is that the person testifying demonstrate that he or others in his company "knew of the events recorded on the third party documents." *Duncan Dev., Inc. v. Haney,* 634 S.W.2d 811, 814 (Tex. 1982) (holding under the predecessor to rule 803(6) that invoices of subcontractors were properly authenticated by employee of general contractor when employee showed that employees of general contractor checked to ensure that work included on invoices was performed and therefore were able to confirm the accuracy of the invoices). The purpose in requiring that the "qualified witness" know of the events in the records is to ensure the accuracy of the records. *See Cockrell v. Republic Mortgage Ins. Co.,* 817 S.W.2d 106, 112–13 (Tex.App.—Dallas 1991, no writ); *Duncan Dev., Inc.,* 634 S.W.2d at 813–14.

Here, the record demonstrates that the information contained in the test core results was accurate. First, Kingsley explained how the samples of concrete were taken: the testing company extracts concrete from the road being built and measures the length of the sample. On voir dire by Houston Shell's lawyer, he also stated that he personally watched the core samples being taken on two of the jobs involved in this lawsuit and that Kingsley employees observed the other two samples being taken. He also testified that, when the tests were performed, he or his employees noted the results of the tests. Then, he testified, as an engineer, that the system used by the State and the independent lab yields reliable, accurate results and that they are relied upon by engineers and "other highway individuals" to determine concrete depth. Finally, he stated that the results of the tests were always compiled and sent to him shortly after the samples were taken. We hold that this testimony sufficiently authenticated the test core results and therefore that the results were properly admitted into evidence. *See Cockrell,* 817 S.W.2d at 112–13; *Duncan Dev., Inc.,* 634 S.W.2d at 813–14. Consequently, we overrule Houston Shell's first point of error.

In its second point of error, Houston Shell argues that the trial court erred in submitting jury questions 4, 5, 6, and 7 because there was no evidence to support their submission. Question 4 asked if Houston Shell agreed to deliver concrete at 150 cubic yards per hour on eight separate jobs. Questions 5–7 asked if Houston Shell failed to comply with the agreements on the jobs, if the failure to comply was excused, and how much Kingsley should receive for a breach of the agreements.

Houston Shell objected only to question 4, which had to be answered affirmatively before the jury could answer questions 5 through 7. The objection was that the record contained no evidence, or that the evidence in the record was insufficient, to support the submission of the question. Rather than considering whether Houston Shell waived its objections to questions five, six, and seven, as Kingsley argues, we will address the merits of the objection because the resolution of that question disposes of Houston Shell's point of error.

As mentioned, Houston Shell maintains that there was no evidence or insufficient evidence to support the submission of these questions. However, the record contains evidence that Kingsley and Houston Shell agreed to a specific rate of delivery of the concrete. Kingsley testified about five of the eight projects, specifically testifying about language contained in the purchase orders requiring Houston Shell to deliver the concrete at a rate of 150 cubic yards per hour.[2] In addition, Kingsley and Houston Shell introduced into evidence the contracts for each job. Thus, the two contracts Kingsley did not testify about were before the jury. They contained the same language as the contracts Kingsley explained to the jury; the language required a delivery rate of 150 cubic yards per hour. This testimony was introduced without objection and the exhibits were introduced jointly.

In short, the evidence was introduced and sufficient to support the submission of the questions. We overrule point of error two.

 In its final point of error, point three, Houston Shell urges us to hold that the trial court erred in awarding prejudgment interest on three jobs at the rate of 6 per cent per annum. It claims that the court should have awarded interest at 18 per cent per annum. As we discuss below, we find nothing in the record to support this contention.

Although Houston Shell claims the trial court applied the wrong interest rate, it cites us to no testimony in the record that would contradict the trial court's judgment and sup-

port its claim. Houston Shell claims a credit application supports its claim. However, the credit application reflects that it was submitted in conjunction with one particular job. Nothing in the application refers to other jobs. In addition, the credit application itself does not state that it applies or does not apply to other jobs. Furthermore, we do not know if the other jobs were started or completed before this credit application was executed and we have been cited to nothing in the record to reflect the temporal relationships between the jobs. Without some other evidence to show that it should apply to the other contracts, we decline to so hold as a matter of law. Consequently, we overrule point of error three and affirm the judgment of the trial court.

---

2. Although it makes no difference to the outcome, for the sake of accuracy, we note that one of the jobs required a delivery rate of 160 cubic yards per hour.